H. A. JOHNSON & COMPANY, Respondent, v. SPRINGFIELD ICE & REFRIGERATING COMPANY, Appellant.

Springfield Court of Appeals, April 4, 1910.

1. BAILMENT: Negligence of Warehouseman: Act of God. Plaintiff had a number of barrels of crystallized eggs stored in the basement of defendant's warehouse. The eggs were ruined during an unprecedented flood presumably by water backing up from the sewer through the drain-pipe leading from the basement. Evidence examined and held sufficient to justify the submission of the cause to the jury, on the theory that defendant knew or, by the exercise of ordinary care, could have known that

the basement was in danger of becoming flooded and, by the exercise of ordinary care, defendant could have prevented the damage by removing the eggs to a place of safety.

2. ————: ————: ————. A warehouseman cannot escape liability for damage from an unprecedented flood to goods stored in his warehouse where it appears that his own negligence, commingling with the act of God as an active and co-operative element, resulted in damages to the goods. The warehouseman would be excused for failure to exercise ordinary care only in cases where the superior force of the act of God would have produced the same damage whether the warehouseman had been negligent or not.

3. **EVIDENCE: Admission of Incompetent Testimony: Harmless Error.** Even where evidence was improperly admitted, when it appears from the verdict, which was rendered under proper instructions, that the evidence admitted did not materially affect the merits of the case, and the evidence was merely cumulative in its character, its admission will not be reversible error.

4. ————: **Principal and Agent: Declarations of Agent.** Declarations made by an officer, agent or employee, during the transactions for which he is employed, for his principal and connected therewith, and forming a part of the *res gestae*, are admissible.

5. **PRINCIPAL AND AGENT: Agent's Knowledge.** The principal is bound by such knowledge as the agent obtains in the scope of his employment and whether the agent discloses same or not.

6. **EVIDENCE: Market Value.** The price paid for an article is some evidence of its market value.

7. **PLEADING: Objections to Petition.** A defective statement of a cause of action is good after verdict and cannot be taken advantage of by an objection to the admission of testimony, unless the petition fails to state a cause of action owing to the omission of an essential averment.

8. **NEGLIGENCE: Question of Law.** Before a court can consider a question of negligence as a matter of law, it must determine that the facts are undisputed and that but one inference can be drawn from them.

Appeal from Laclede Circuit Court.—*Hon. L. B. Woodside,* Judge.

AFFIRMED.

*Horine & Delaney* for appellant.

(1)   The court erred in admitting evidence of the
price paid by plaintiff for the property in question.
This is not proper evidence of damage.   Miller v. Bry-
den, 34 Mo. App. 602; St. Louis Range Co. v. Kline-
Drummond Co., 120 Mo. App. 438.   (2)   The court
erred in admitting in evidence the alleged conversations
with defendant's servant, Grant Trammel, touching the
value and character of the goods bailed, and referring
to the storm, and safety of said goods.   Redmon v. Rail-
way, 185 Mo. 1; Wright Inv. Co. v. Fillingham, 85
Mo. App. 534; Helm v. Railway, 98 Mo. App. 419; Fow-
ler v. Randall, 99 Mo. App. 407; Kyle v. Gaff, 105 Mo.
App. 672.   (3)   It having been shown that the injury
resulted from an act of God, by the plaintiff's own
evidence, the defendant is excused unless plaintiff fur-
ther shows that the defendant was guilty of negligence
proximately contributing to the loss.   Davis v. Rail-
road, 8 Mo. 340; Turner v. Haar, 114 Mo. 347; Milling
Co. v. Lime Co., 122 Mo. 258; Reeves v. Railroad, 10
Wall. 189; Lancaster Mills v. Merchants Co., 89 Tenn.
1; Willing v. Railroad, 101 Mo. 631; Cummings v.
Mastin, 43 Mo. App. 558; McCarthy v. Wolfe, 40 Mo.
520; Gashweiler v. Railroad, 83 Mo. 112; Buddy v.
Railroad, 20 Mo. App. 206; O'Malley v. Railroad, 113
Mo. 319; Stoher v. Railroad, 105 Mo. 192; McPherson
v. Railroad, 97 Mo. 253; Otis v. Railroad, 112 Mo. 622;
Henry v. Railroad, 76 Mo. 294; Sullivan v. Railroad,
133 Mo. 1; Brewing Ass'n v. Talbot, 141 Mo. 674;
Frichs v. St. Louis, 167 Mo. 650; Dean v. Railroad, 199
Mo. 408.   (4)   Mischief which could by no reasonable
possibility have been foreseen, and which no reasonable
person would have anticipated, cannot be taken into
account as a basis upon which to predicate a wrong.
Brewing Assn. v. Talbot, 141 Mo. 674; Feddeck v. Car
Co., 125 Mo. App. 32; Aldrich v. Transit Co., 101 Mo.
App. 90; Strode v. Box Co., 124 Mo. App. 524; Good-

rich v. Railroad, 152 Mo. 222; Warehouse v. Railroad, 124 Mo. 557; Grier v. Railway, 108 Mo. App. 564; Moffat Com. Co. v. Railway, 113 Mo. App. 544; Loehring v. Construction Co., 118 Mo. App. 177; Leitner v. Grieb, 104 Mo. App. 173; Anderson v. Forrester, 103 Mo. App. 382; Hysel v. Swift & Co., 78 Mo. App. 39; Foley v. McMahon, 114 Mo. App. 442; Young v. Railroad, 93 Mo. App. 275.

*Barbour & McDavid* and *Woodruff & Mann* for respondent.

(1) If it was error to permit plaintiff to state in his deposition the price he paid for the eggs, it is not reversible because it did not materially affect the merits of the case. R. S. 1899, sec. 865; Wilkinson v. Ins. Co., 54 Mo. App. 661; Gardner v. Railway, 135 Mo. 90; Goodrich v. Harrison, 130 Mo. 263; Woody v. Railroad, 104 Mo. App. 678. (2) Declarations made by an officer, agent or employee, and made during the transactions for which he is employed, for his principal and connected therewith, are admissible. Investment Co. v. Fillingham, 85 Mo. App. 534; Helm v. Railway, 98 Mo. App. 419. (3) The principal is charged with the information of his agent; and whether the agent discloses same or not, he is conclusively presumed to have done so. Fowler v. Randall, 90 Mo. App. 407; Meachem on Agency, sec. 721; State ex rel. v. Sittlington, 51 Mo. App. 252; Kyle v. Gaff, 105 Mo. App. 672. (4) A defendant cannot escape the consequences of its negligence, because the flood was the act of God. Prince v. Compress Co., 112 Mo. App. 49; Davis v. Railway, 89 Mo. 340; Pinkerton v. Railway, 117 Mo. App. 288; Smith v. Fordyce, 190 Mo. 21; Newcome v. Railroad, 169 Mo. 422; Warehouse Co. v. Railway, 124 Mo. App. 560; Brash v. St. Louis, 161 Mo. 438; Lamar Mfg. Co. v. Railroad, 117 Mo. App. 459; Wolf v. Express Co., 43 Mo. 421; Grier v. Railroad,

108 Mo. App. 565; Harrison v. Light Co., 195 Mo. 622; Hoepper v. Hotel Co., 142 Mo. 388.

NIXON, P. J.—This cause was instituted in the circuit court of Greene county, Missouri, and through changes of venue reached the circuit court of Laclede county where it was tried at the February term, 1908.

The plaintiff was a firm composed of H. A. Johnson of Boston, Massachusetts, a commission merchant. The defendant is a corporation with its chief place of business at Springfield, Missouri, and was at the time of the institution of this suit engaged, among other things, in the warehouse business, receiving goods for storage for safe keeping.

The Springfield Crystallized Egg Company was a corporation, engaged in manufacturing from eggs a food product called crystallized eggs, which when manufactured and ready for the market, was put up in ordinary flour barrels, and encased in oil paper to protect it from the dust. When the product was so barreled, the barrels were numbered with the current number and labeled with two labels, one with the name of the product, stating that it was manufactured by the Crystallized Egg Company, and another label bearing the word "Caution" in large red letters, and below it, "This package must be kept covered in a cool, dry place." The thirty barrels of this product involved in this suit bore this label. The destruction of this product by an unprecedented flood in the city of Springfield on July 26, 1905, forms the basis of this action.

In October, 1904, the Crystallized Egg Company sold to the plaintiff, H. A. Johnson & Company, fifty barrels of this product which included the thirty barrels involved in this litigation. At the time of the sale, these goods were in the warehouse of the factory of the Springfield Crystallized Egg Company, and were then sent to the defendant's warehouse for storage in the same city. They were taken to the defendant's ware-

house by the regular drayman of the Egg Company, George Williams. There was present at the warehouse when the goods were delivered one W. N. Seymour, superintendent of the Egg Company, and when they arrived they were received by Grant Trammel and a warehouse receipt to the Springfield Crystallized Egg Company was issued for them. This receipt was assigned by the Egg Company to the plaintiff and mailed to him with an invoice of the fifty barrels. The bill of the goods sent by the Egg Company to the plaintiff with the receipt gave the numbers of each of the fifty barrels so sold and stored, being from number 7820 to number 7831, inclusive, and beginning again with number 7856 and running to number 7893, inclusive. The conditions appearing in the warehouse receipt are as follows:

"It is agreed that all loss or damage to property occasioned by fire, water, leakage, vermin, ratage, breakage, accidental or providential causes, riot or insurrection, or to perishable property, is at owner's risk."

These goods when first taken to defendant's warehouse for storage, were stored in cold storage on one of its upper floors, but later they with goods of like character belonging to the Egg Company were moved to the basement of said warehouse and there stored.

The testimony for the plaintiff shows that the receipt for the eggs was forwarded by plaintiff to the defendant on October 18, 1904, referred to as warehouse receipt No. 73, covering fifty barrels of eggs stored by the Springfield Crystallized Egg Company, and asking the defendant to ship one barrel to George H. Perry & Co., Rochester, New York, and to send number and weight so that plaintiff might bill it to the customer. The letter of the defendant returning this receipt stated that the number of the barrel shipped to Perry & Co. was indorsed thereon. On October 26th, the shipment of this barrel was indorsed on the back of this ware-

house receipt as barrel No. 7893. In November, plaintiff again sent the receipt to the defendant who shipped one barrel and indorsed on the back of the warehouse receipt that it was barrel No. 7865. In December, a similar occurrence took place and on the back of the warehouse receipt, the defendant indorsed that the barrel shipped was No. 7872. In March, 1905, plaintiff ordered shipped to him direct, seventeen barrels, and on the back of the warehouse receipt was indorsed the shipment of the seventeen barrels; being shipped direct to plaintiff himself, the numbers of these barrels were not indorsed on the back of the warehouse receipt. These several shipments, amounting to twenty barrels, left the thirty barrels in the warehouse which are concerned in this action, where they remained until the disastrous flood on the 26th day of July, 1905.

W. N. Seymour, superintendent of the Egg Company, stated that he could identify the barrels stored for plaintiff by their numbers. He said that he saw those barrels in the basement at the time of the flood, July 26, 1905, and recognized them as the goods they had sold to H. A. Johnson & Company and stored with the defendant for Johnson; that they were located on the east side of the basement, the farthest lot to the north, and that they were separated from the other eggs stored in the basement by a space of about eighteen inches; that Grant Trammel pointed out these eggs to him the next morning and Grant Trammel was then there in charge of the warehouse. This witness also stated that when these goods were stored, they were received by Grant Trammel who delivered a warehouse receipt for them and who was there acting for the defendant, and who usually had charge of that portion of defendant's business.

Trammel testified that he was "a kind of a foreman there under Mr. Meyer." That he was a foreman over the men in the daytime and kept account of the things going out and coming in, and gave dray tickets

for them; that when things went out, they were de-
livered through him. "I give them a receipt for it and
they sign it. Q. You are the man they had in charge
there at the time? A. Yes, sir. Q. Were you in
charge of it on the 26th day of July, 1905? A. Yes,
sir."

W. N. Seymour further testified that Trammel
knew the character of these goods; that he notified
Trammel of their value—told him they were worth in
the neighborhood of one hundred dollars per barrel;
that they were crystallized eggs and very valuable.
And F. P. Clements testified that he called Trammel's
attention to the danger of allowing water to collect
on the floor.

Late in the afternoon of July 26th, when nearly
all places in the vicinity of the warehouse were flooded,
Seymour went to the warehouse and found Trammel
in charge and inquired as to the danger of water get-
ting into the basement where the eggs were stored.
The next morning when he was there again, he found
that the barrels had all been submerged, had absorbed
a great quantity of water, and when the barrels were
opened, the eggs were found to be totally ruined as a
food product. The evidence tended to show that the
water in the basement the next morning was dirty and
slimy.

Seymour testified that there was an average of
seven hundred dozen eggs to the barrel and that these
barrels were worth from eighty to one hundred dollars
each; that the barrels weighed from 182 to 208 pounds,
the 182-pound barrels being worth on the market on
July 26, 1905, eighty-five dollars each.

Appellant's property fronts on Mill street, and is
located on the north side thereof, midway between
Campbell street and Boonville street. Wilson creek, or
a creek known as the Jordan, runs parallel with Mill
street from the northeast to the southwest, and has an
average fall of about three-tenths of a foot to the one

hundred feet. It drains all that part of the city of Springfield known as North Springfield, and drains considerable property north and east of the city. It runs about one hundred and thirty feet south of defendant's property and is confined in a rather narrow channel in that part of the town. The elevation of the first floor of appellant's warehouse is fourteen and one-half feet above the mouth of the district sewer, which empties into the Jordan just southeast of the basement in which the egg product was stored. The basement was nine feet in depth, leaving the bottom of the basement five and one-half feet above the mouth of the district sewer. The drain-pipe that connected with the basement tapped the district sewer at the southwest corner of the Central Hotel on the north side of Mill street, which was the lowest point; from that point, it was one hundred and thirty feet to where the workmen in putting in the drain-pipe entered the warehouse. In putting in the drain-pipe, the workmen had to run on a very close grade to get into the warehouse and give it the proper fall to drain the water and seepage out of the basement. The sewer put in was a six-inch one, tapping the eight-inch district sewer. The grade was about one-sixteenth of an inch to the foot for about sixty feet and then it had a better grade.

The rain at Springfield on July 26, 1905, was torrential and the flood unprecedented. The water was never so high before in the Jordan creek and valley and overflowed to an unprecedented degree. The hardest rain of all fell at about eight o'clock the night of that day.

Seymour testified that at about six o'clock in the evening he went over to the warehouse and he noticed then that the water was all over the streets and railroad tracks. He called Trammel's attention to the water being on the tracks and asked Trammel if there was

any danger of water getting in the basement, and Trammel said there was not, but he did say there had been a little seepage in the northwest corner. At this time, there was a train standing at the depot, some distance to the west, and on account of the high water passengers were being unloaded on trucks and carried over to the depot. The water was then receding from the streets but was rising in the Jordan.

·Trammel testified that no water came in at the windows of the basement to his knowledge, and that between four and five o'clock in the afternoon the cellar was dry. That the last time he saw the cellar that day was about ten minutes of six o'clock in the evening and that he discovered the water in the basement the next morning at ten minutes after seven o'clock. He says he locked the doors when he left on July 26th; that the night watchman reported on the other side of the building at the ice office and that the night watchman stayed there all night.

The night watchman testified that he was in the basement on only one occasion that night; that it was about nine o'clock and that the basement was dry at that time.

John Cowell, for defendant, testified that he was a stonemason and contractor; that he knew the building of the defendant and was familiar with the construction of the basement; that six and one-half feet of it was under ground and the balance above ground. That the basement was first-class and had a concrete floor; that he was at the building the next morning after the flood, early in the morning; that at that time, Mr. Meyer, the mayor of the city and manager of the company, was away, and that witness was acting-mayor in his absence; that in such capacity, he went out to relieve the citizens in general, calling out the fire chief, and the fire engine was brought to help pump out this cellar. He said that he observed no evidence of water flowing in at the windows.

It was also shown that at the time of the flood, this building was equipped with an electric freight elevator which had a platform that would hold from ten to fifteen barrels; that it operated in the basement and that only one man was required to operate it.

Among other instructions, defendant asked one in the nature of a demurrer to the evidence, which was refused.

## OPINION.

I. The first assignment of error to which appellant directs our attention is as to the alleged insufficiency of the petition to sustain the verdict. An examination of the petition shows that such objection is not well taken. The petition complies with every requirement of the law and states a cause of action affirmatively and sufficiently and is not open to the criticism of appellant. [Prince v. St. L. Compress Co., 112 Mo. App. 49, 86 S. W. 873.]

But had the petition been inartistically drawn, the objection to its sufficiency should have been made by demurrer or by motion to make more specific, before verdict, and the objection comes too late as to any irregularities after the trial. A defective statement of a cause of action is good after verdict and cannot be taken advantage of by an objection to the admission of testimony unless the petition fails to state a cause of action owing to the omission of an essential averment. The practice is to be discouraged of allowing a party to a suit to lay in wait for his adversary until the trial is completed and when he finds at the last moment that the decision is against him, to spring upon the court a technical objection to the sufficiency of the petition. [Townsend v. City of Joplin, 139 Mo. App. 394, 123 S. W. 474; Jones v. Philadelphia Underwriters, 78 Mo. App. loc. cit. 303.]

II.   Appellant in its second assignment of error urges that the trial court committed reversible error by admitting improper evidence.

It is contended that the court should not have permitted plaintiff to testify to the price paid by him for the eggs in controversy.   He testified that he paid a greater sum per barrel than that which was allowed by the jury in its verdict, and the jury was confined in the assessment of damages to the market value of the eggs by instructions.   The price paid is some evidence of the market value.   [Miller v. Bryden, 34 Mo. App. 602.]   The witness Haldeman qualified as to knowledge of the market value of the thirty barrels of eggs at the time of their destruction by the flood, and the jury in assessing the damages followed proper instructions given by the court as to their market value.   If, therefore, it was error to permit plaintiff to state in his deposition the price he paid for the eggs, it is not reversible error because his statement did not materially affect the merits of the case.   The evidence was purely cumulative and its admission was not reversible error.   [Thompson v. St. L. & S. F. R. Co., 59 Mo. App. loc. cit. 40.   See also sec. 865, Rev. Stats. 1899; Wilkinson v. Metropolitan Ins. Co., 54 Mo. App. 661; Gardner v. St. L. & S. F. R. Co., 135 Mo. 90, 36 S. W. 214; Goodrick v. Harrison, 130 Mo. 263, 32 S. W. 661; Woody v. St. L. & S. F. R. Co., 104 Mo. App. 678, 78 S. W. 658.]

The same answer may be made to the objection of appellant to the introduction of the invoice of the goods sold by the Egg Company to the plaintiff.   The invoice was competent because it set out the current numbers of the barrels of eggs sold, and in that manner individuated them and showed just what was sold by the Egg Company to plaintiff.   In no event can the error, if one at all, be considered prejudicial.

So, also, as to appellant's complaint that the warehouse receipt does not individuate any property.

The complaint that the court erred in admitting evidence of the yearly sales made by the Egg Company is trivial. Mr. Haldeman, an officer of the Egg Company, did testify as to the yearly sales of the Egg Company, made under his supervision. The record shows that he was merely asked that question for the purpose of showing that he was qualified to testify as to the market value of the product.

The objection that the evidence of the alleged conversation with defendant's servant, Grant Trammel, touching the value and character of the goods bailed, and referring to the storm and safety of the goods, was prejudicial error, is not well taken. At the times of these conversations with Trammel, he was the foreman of defendant, in charge of its warehouse where these goods were placed, and the conversations referred to the regular course of business that he then had in charge for his master, the defendant. Declarations made by an officer, agent or employee, during the transactions for which he is employed, for his principal and connected therewith, and forming a part of the *res gestae*, are admissible. [Thompson v. St. L. & S. F. R. Co., 59 Mo. App. 37; Wright Inv. Co. v. Fillingham, 85 Mo. App. 534; Helm v. Mo. Pac. Ry. Co., 98 Mo. App. 419, 72 S. W. 148.] The principal is charged with the information of his agent, and whether the agent discloses same or not, he is conclusively presumed to have done so. [Fowler v. Randall, 99 Mo. App. 407, 73 S. W. 931; State ex rel. v. Sitlington, 51 Mo. App. 252.] The principal is bound by such knowledge as the agent obtains in the scope of his employment. [Kyle v. Gaff, 105 Mo. App. 672, 78 S. W. 1047.]

There is no merit in the contention that it was error to permit witness Shields, who constructed the drain-pipe from defendant's basement at the original construction of the building, to testify on the ground that there was no evidence that knowledge of such fact was ever brought home to defendant. It was compe-

tent to show the construction of the warehouse as a fact to go to the jury as to appellant's negligence.

III.   Appellant urges that the evidence was insufficient to individuate the thirty barrels of crystallized eggs as between plaintiff and defendant, and appellant invokes the application of the principle of law that where goods and chattels are a part of a larger mass and susceptible of separation and identification, such separation must take place before the title can pass.

Under the evidence, the determination of this case does not require us to consider whether there can be a bailment unless the identical thing bailed is to be returned to the bailor.   The evidence is ample to prove that the thirty barrels of crystallized eggs, for the destruction of which this suit was brought, were in the basement of the defendant's warehouse at the time of the flood, and were not only the property of the plaintiff, but they had been separated from the other barrels of eggs stored in such warehouse.   The uncontradicted evidence is that the barrels sold to the plaintiff were numbered from number 7820 to number 7831, inclusive, and from number 7856 to number 7893, inclusive, W. N. Seymour, superintendent of the Egg Company, testified that he identified the thirty barrels of plaintiff's property by their numbers and that they were in the basement of appellant's warehouse at the time of the flood; that he saw them and recognized them as the identical eggs sold to the plaintiff and stored with the defendant for the plaintiff; that they were located on the east side of the basement and were separated from the other eggs stored in the basement by a space of about eighteen inches.   This evidence was ample to carry the case to the jury.

IV.   Appellant contends with great insistence that the demurrer to the evidence should have been sustained and that its refusal by the trial court constituted reversible error.

At the trial, the question of negligence was presented to the jury by an instruction in the following language:

". . . and if you further find from the evidence that during said 26th day of July, 1905, a heavy and extraordinary rainfall at said place produced a great flood of water which caused said basement where the eggs were stored by defendant to be in danger of becoming flooded with water and said eggs to be in danger of coming in contact therewith and that the defendant, its agents, and servants were warned and knew of said danger or that they could have known by the exercise of ordinary care on their part that said basement was in danger of being flooded by said water getting into said basement and that defendant could then have, by the exercise of ordinary effort and diligence, removed said eggs to a place of safety and prevented said injury or damage to them and failed to do so and that through said failure of the defendant, said eggs became saturated with water and were ruined or damaged, your verdict should be for the plaintiff."

This instruction presented in plain language the questions which the jury were required to find in order to entitle the plaintiff to recover. . Their verdict shows that on a full consideration of the evidence, they found the facts set up in this instruction to be true, and accordingly returned their verdict for the plaintiff. On motion for new trial, this verdict was upheld by the trial judge who saw the witnesses and heard their evidence. Appellant now demands that this court find as a matter of law that there was no substantial evidence in the record to justify the finding of the jury.

The rules established for the guidance of appellate courts in the determination of the sufficiency of evidence to withstand a demurrer have been variously stated, but in their last analysis converge upon one point, that however great the weight or preponderance of the evidence, it is for the jury to consider the cred-

ibility of the witnesses and the weight of the testimony by comparing and considering the balancing probabilities. Otherwise stated, the rule is, before a court can consider the question of negligence as a matter of law, it must determine that the facts are undisputed and that but one inference can be drawn from them. No citation of authorities is necessary to sustain these elementary principles.

The defendant cannot escape the consequences of its negligence because the flood was an act of God. It is a well-settled principle that if the defendant's negligence commingled with and operated as a contributive element proximate to the injury, it is liable even though such injury was due to an act of God. In order for the defendant to escape liability under the exemption afforded by law, the act of God must be the sole and only cause of the injury and this too, unmixed with the negligence of the defendant, for if defendant's negligence commingled with it in the loss as an active and co-operative element and the loss is proximate thereto, or, in other words, is a reasonable consequence of the negligent act, it is regarded in law as the act of the defendant rather than as the act of God. The principle is manifest from all of the cases and evidence of its proper application abounds in the books. [Prince v. St. L. Compress Co., 112 Mo. App. 49, 86 S. W. 873; Davis v. Wabash, St. L. & P. Ry. Co., 89 Mo. 340, 1 S. W. 327; Smith v. Fordyce, 190 Mo. loc. cit. 21, 88 S. W. 679; Newcomb v. N. Y. U. & H. R. Ry. Co., 169 Mo. loc. cit. 422, 69 S. W. 348; Gratiot Street Warehouse Co. v. M. K. & T. Ry. Co., 124 Mo. App. loc. cit. 560, 102 S. W. 11.]

The rule as to defendant's negligence is that defendant is excused for failure to exercise ordinary care only in such cases where the superior force of the act of God would have produced the same damage whether the defendant had been negligent or not. [Brash v. City of St. Louis, 161 Mo. loc. cit. 438, 61 S. W. 808.] De-

fendant as the proprietor of a warehouse, even in a calamity produced by a flood, was charged with the duty of exercising care commensurate with the exigencies of the situation in which it and the goods were then placed to protect those whom it served for profit against injury from apprehended danger. [Kansas City v. Morton, 117 Mo. loc. cit. 458, 23 S. W. 127.]

It appeared from the evidence in this case that there was an extraordinary flood which forced water into defendant's basement and which damaged and destroyed plaintiff's goods. If the jury, under the evidence introduced, were authorized to conclude that means were at hand with which the goods could have been quickly elevated to the next floor or to a place of safety, and that the loss which ensued would not have taken place had not the neglect and inattention of the defendant's employees co-operated with the flood in producing the result, then the defendant was liable. [Wolf v. American Exp. Co., 43 Mo. 421; Grier v. St. L., M. B. T. Ry. Co., 108 Mo. App. 565, 84 S. W. 158; Harrison v. K. C. El. Lt. Co., 195 Mo. loc. cit. 629, 630, 93 S W. 951.]

We think under the rules governing appellate practice there was sufficient evidence in this case to carry it to the consideration of the jury. There is certainly some evidence tending to show negligence in appellant's failure to properly guard the egg product from the flood. The evidence unquestionably shows that between five and six o'clock of the afternoon of the storm, Seymour, superintendent of the Egg Company, became apprehensive that the eggs were in danger and went to the warehouse for the purpose of ascertaining their condition; Trammel, the man in charge of the warehouse for the defendant on that occasion, stated that there was a little seepage in the northwest corner. There was some evidence to show that in the construction of the building there was a sewer leading from the building to the district sewer, and that it had been

laid at so low a grade that the water backed up over half-way from the main sewer to the building when this pipe was put in and it was hot water from the coils of defendant's plant. The whole question as to the construction of this basement, its connection with the sewer and the Jordan, was before the jury for its consideration. It was also shown that when the night watchman came on duty that night, Seymour and Trammel were having a conversation as to the condition of the basement and the safety of these goods, so that the parties in charge of the goods were fully advised. They knew the condition of the flood; it was unprecedented in its extent. The evidence shows that the hardest rain fell about eight o'clock that night, falling on top of the floods that had already devastated the Jordan valley. The flood was so great that the acting-mayor went down to this place the next morning and had the fire engine pump the water out of this basement. The defendant was not responsible for the storm; but the defendant and its agents knew that outside there was water everywhere and knew the extent of the flood and had no right to assume that because the building had withstood the onslaughts of previous rains that it would withstand the effects of this unprecedented downpour. They had in their charge goods of the value of at least twenty thousand dollars, and, as said by respondent in his brief, "They didn't even devote as much time, attention or care to these goods, of this great value and of extreme susceptibility to destruction by moisture, that the farmer's wife devotes to her hens and chickens in the ordinary rain." Upon a careful examination of the evidence adduced in this case, having in mind the rules governing appellate practice, we have concluded that we ought not to declare as a matter of law that there was no evidence justifying the finding of the jury.

We find no reversible error in the instructions. Some of the instructions, it is true, might have been

properly given as requested by defendant, but the same propositions of law were substantially incorporated in those that were given, and the error, if any, was harmless. The question of negligence under the evidence was one for the jury, and the responsibility for the finding of facts must rest with them where the law has placed it. The case was submitted to the jury under proper instructions, under competent and relevant testimony, and no material error affecting the result was committed by the trial court. The judgment is accordingly affirmed. All concur.